UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

RYAN J. BONIVERT,

                    Plaintiff,

    v.

CITY OF CLARKSTON, et al.,

                    Defendants.

NO:  2:14-CV-0056-TOR

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT

BEFORE THE COURT are the following motions: Asotin County Defendants' Motion for Summary Judgment (ECF No. 61); Clarkston Defendants' Motion & Memorandum of Authorities in Support of Motion for Summary Judgment (ECF No. 71); and Defendants' *Daubert* Motion to Exclude Portions of Expert Witness Winthrop Taylor's Report and Testimony (ECF Nos. 77, 79). These matters were heard with oral argument on March 12, 2015. Samual T. Creason appeared on behalf of Plaintiff. Ann E. Trivett appeared on behalf of the Asotin County Defendants. Christopher J. Kerley appeared on behalf of the City

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT ~ 1

of Clarkston Defendants.  The Court has reviewed the briefing and the record and
files herein, heard from counsel, and is fully informed.

## BACKGROUND

Plaintiff filed his initial Complaint in this action on February 25, 2014,[1]
alleging that Defendants violated 42 U.S.C. § 1983 when they, *inter alia*, entered
and searched Plaintiff's home without a warrant, applied excessive force,
unjustifiably arrested Plaintiff without a warrant, and subjected Plaintiff to
degrading treatment while in custody.  ECF No. 1.  Plaintiff has sued several
County of Asotin and City of Clarkston officials in their individual capacities, as
well as their spouses.  *Id.*  Plaintiff has also sued the County of Asotin and the City
of Clarkston.  *Id.*

In the instant motions, Defendants move for summary judgment on all
claims.  ECF Nos. 61, 71.  Defendants also jointly move to exclude portions of the
report and testimony of Plaintiff's expert witness, Mr. Winthrop Taylor.   ECF
Nos. 77, 79.

//

//

//

---

[1] Plaintiff subsequently filed his First Amended Complaint on November 19, 2014,
and his Second Amended Complaint on December 22, 2014.  ECF Nos. 49, 53.

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT ~ 2

# FACTS[2]

In the early hours of January 8, 2012, Sergeant Danny Combs and Officer Paul Purcell responded to a "physical domestic" dispatch to Plaintiff Ryan Bonivert's home in Clarkston, Washington.  ECF Nos. 72 ¶ 9; 94 ¶ 18; 107-1; 107-3. The dispatcher had been "advised the male was inside the house being restrained by other males," that "[i]t was physical at one point," and that the "female [was] "outside in a car with a child," which information the dispatcher relayed to the officers.  ECF Nos. 107-1; 107-3.  Sergeant Combs and Officer Purcell were the only two officers patrolling for the City of Clarkston ("City") at the time.  ECF No. 62 ¶ 6.  Although the two officers were in separate patrol vehicles, it was the City's policy for both patrol officers to respond to a domestic violence call.  ECF No. 72 ¶ 6.  Officer Purcell arrived at Plaintiff's residence around 2:08 a.m., with Sergeant Combs arriving shortly thereafter.  ECF Nos. 72 ¶ 10; 94 ¶¶ 19-20; 107-1; 107-3. When the officers arrived, they encountered five people standing in front of the house.  ECF No. 53 ¶ 3.6.

The officers interviewed those present outside the residence.  Sergeant combs spoke with two males, Mr. Gray and Mr. Miller.  ECF Nos. 72 ¶ 12; 94 ¶ 28.  According to Sergeant Combs, the males told him that Jessie Ausman and Plaintiff were in a relationship, had a child together, and had gotten into an

---

[2] The following are the undisputed material facts unless otherwise noted.

argument that evening.  ECF Nos. 72 ¶ 13; 93-5 at 81-82; 94 ¶ 53.  Ms. Ausman

had told Plaintiff that she was leaving with the baby, which plan Plaintiff opposed.

ECF Nos. 72 ¶¶ 13-14; 93-5 at 82.  Plaintiff allegedly rushed at Plaintiff and was

tackled by one of the males before he could make contact with Ms. Ausman.  ECF

Nos. 72 ¶ 14; 93-5 at 82.  Plaintiff remained inside the house.

Officer Purcell interviewed a group of three females: Ms. Ausman, her

sister, and her mother.   ECF Nos. 72 ¶ 11; 93-5 at 81-82; 94 ¶ 29.  According to

Officer Purcell, the females relayed a similar narrative with the only difference

being that when Plaintiff rushed at Ms. Ausman, he actually made contact and

threw her to the ground.  ECF Nos. 72 ¶ 15; 93-5 at 82; 94 ¶ 32.  Ms. Ausman

allegedly complained of back pain from the incident, either to Officer Purcell,

Sergeant Combs, or both.  ECF Nos. 72 ¶ 17; 93-5 at 82; 94 ¶ 38.  In her

deposition testimony, Ms. Ausman testified that although she probably did not

recount the night with the depth of detail provided at her deposition, she asserts

that she told the officers "exactly what had happened that night."  ECF Nos. 93-11

at 29; 95 ¶ 34.  Plaintiff does not dispute that these witnesses made statements

regarding the encounter between Plaintiff and Ms. Ausman; rather, he questions

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT ~ 4

what information was provided, in what detail it was provided, and the reliability of these statements.[3]  *See*  ECF No. 96.

The two officers then exchanged narratives and decided to speak with Plaintiff.  ECF Nos. 93-5 at 82; 94 ¶ 57.   The officers then approached the front door of Plaintiff's residence, knocked loudly, identified themselves as police, and instructed Plaintiff to come to the door.  ECF Nos. 72 ¶ 20; 93-5 at 82; 94 ¶¶ 68, 70.  When there was no response, Sergeant Combs proceeded to knock on other doors and windows of the residence, as well as look through the windows with the assistance of his flashlight.  ECF Nos. 72 ¶ 21; 93-5 at 82; 94 ¶¶ 71, 75.  In his deposition, Sergeant Combs testified that he was not certain that Plaintiff would have been able to hear his initial knocking on the front door.  ECF No. 93-5 at 64.  Plaintiff testified that he heard loud banging on his front door but neither knew who was at the door, nor could understand what he was saying.  ECF No. 62 ¶ 55.  When Sergeant Combs approached the side door on the north side of the house, he heard it lock as he was approaching.  ECF Nos. 62 ¶ 56; 72 ¶ 22; 93-5 at 82; 94 ¶¶ 76, 78 (noting that Sergeant Combs informed Officer Purcell of this action).

---

[3] Sergeant Combs had the impression that all the witnesses had been drinking.  ECF No. 72 ¶ 19.  Ms. Ausman recalls telling the officers, in response to questioning whether alcohol had been a factor in the incident, that they had all been drinking that night.  ECF No. 93-11 at 5.

Sergeant Combs testified that, upon hearing the door lock, he formed the opinion that Plaintiff did not want to speak with him.  ECF No. 94 ¶ 76.  At this point, Plaintiff understood that there were police officers outside and that they were asking him to come outside.  ECF No. 62 ¶ 57.  Plaintiff did not communicate with the officers at this time.

The officers returned to question the witnesses.  In response to questioning whether Plaintiff was a danger to himself, Ms. Ausman recalls saying she did not believe so and informed Sergeant Combs that there were no weapons in the home, which he interpreted to mean there were no firearms.  ECF Nos. 72 ¶ 25; 93-11 at 18.  The females told Sergeant Combs that Plaintiff was volatile and upset, and Ms. Ausman stated that Plaintiff was not acting like himself.  ECF Nos. 72 ¶ 25; 93 ¶¶ 91-92; 93-11 at 32.  In response to questioning about how Plaintiff would respond to having his home broken into, Ms. Ausman warned Sergeant Combs that Plaintiff has a problem with authority and recounted Plaintiff's behavior towards officers during a recent DUI arrest.  ECF Nos. 93-11 at 22; 94 ¶ 93.  Ms. Ausman was visibly upset when speaking to the officers.  ECF Nos. 93-5 at 57; 93-11 at 33.

At this point, Sergeant Combs decided it was necessary to make contact with Plaintiff and assess his condition.  ECF No. 72 ¶ 27; *see* ECF No. 93-5 at 93-94 (in response to questioning regarding why he decided to enter, Sergeant Combs stated the following: "His state of mind, the volatility of the domestic, and is he going to

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT ~ 6

harm himself, is he harmed at that time, and safety risk to him, us, his . . . girlfriend . . ., and the child. In my judgment, yes I needed to talk to him, and I needed to talk to him right away.").  Ms. Ausman, who had been living in Plaintiff's home for approximately two years, gave Sergeant Combs permission to enter the house. ECF Nos. 62 ¶ 15; 72 ¶ 23; 73 at 39.  Ms. Ausman does not recall whether she gave permission to break a door or window to gain entry; however, Sergeant Combs' police report indicated such permission was given.  ECF Nos. 83-5 at 82; 93-11 at 21-22.

The City officers requested assistance from the Asotin County Sheriff's Office ("County").[4]  ECF Nos. 107-1; 107-3.  Asotin County Deputies Gary Snyder and Joseph Snyder received the radio request from the City to assist in the response efforts at Plaintiff's home.  ECF Nos. 62 ¶ 10; 94 at 108.  Deputies Gary and Joseph Snyder were the only two officers working patrol for the County at the time.  ECF No. 62 ¶ 5. They arrived on the scene at around 2:20 a.m.  ECF Nos. 62 ¶ 11; 94 ¶ 111.  The deputies spoke with Sergeant Combs, the highest ranking City officer at the scene.  ECF Nos. 62 ¶¶ 17-18; 94 ¶ 115.  Deputy Gary Snyder recalls Sergeant Combs telling them that Plaintiff was locked inside the residence and

---

[4] Because the City of Clarkston is located within Asotin County, County officers will respond to requests for assistance from the City when the incident is within the City of Clarkston.  ECF No. 62 ¶¶ 1-2.

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT ~ 7

would not come out after a physical encounter with his wife. ECF No. 62 ¶ 19. Deputy Joseph Snyder recalls Sergeant Combs requesting their assistance to make entry. *Id.* ¶ 20.[5]

The officers developed a plan of entry. ECF Nos. 62 ¶ 21; 94 ¶ 117. Officer Purcell remained at the front door of the residence (the east side) while Sergeant Combs and the County deputies went around to the north side of the residence. ECF Nos. 72 ¶ 32; 94 ¶ 117. Sergeant Combs again knocked on the side and back doors, identified himself as the police, and advised Plaintiff to open the door. ECF Nos. 72 ¶ 32; 94 ¶ 135. Sergeant Combs and Deputy G. Snyder shined their flashlights through the windows and saw Plaintiff retreat into his bedroom. ECF Nos. 62 ¶ 58; 94 ¶ 140. Sergeant Combs approached the back door of the residence (the west side), with Deputy J. Snyder directly behind him and Deputy G. Snyder standing farther back to maintain visibility of the front door. ECF No.

---

[5] The County deputies were aware that the City officers did not have a warrant to enter the home or arrest Plaintiff. ECF Nos. 62 ¶ 26; 94 ¶¶ 113-114. They did not obtain information regarding who owned the residence, who lived at the residence, whether there were outstanding arrests, or what basis the City officers had for entering the home; rather, the County deputies deferred to the City officers, specifically Sergeant Combs, the highest ranking City officer on the scene. ECF Nos. 62 ¶ 4, 24-25, 28; 95 ¶ 1.

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT ~ 8

62 ¶ 44.  The officers were each equipped with a firearm, Taser, and handcuffs.  *Id.* ¶¶ 45-47.  Deputy G. Snyder also had pepper spray and a baton, Deputy J. Snyder also had a baton, and Sergeant Combs also had a folding knife.  *Id.*

Sergeant Combs broke a window pane in the back door with his flashlight and reached through the opening to unlock the door.  ECF Nos. 62 ¶ 51; 72 ¶ 11; 94 ¶ 168.  At this point, Plaintiff opened the door.  ECF Nos. 62 ¶¶ 51, 63-64; 72 ¶ 35; 94 ¶¶ 170-171 (Deputy G. Snyder was less clear about who opened the door).  The officers observed Plaintiff screaming, yelling profanities, standing with fists clenched and chest puffed, "acting aggressive and out of the control," in an "extreme rage," yelling "extremely loud," and acting "very confrontational."  ECF Nos. 62 ¶ 65; 63-2 at 11; 63-3 at 9-10.  Plaintiff admits that he opened the door in a "displeased fashion" and spoke in an "elevated" voice.  ECF Nos. 62 ¶ 64; 63-4; 94 ¶ 173.

Sergeant Combs states that he ordered Plaintiff to stay back, calm down, and get on the ground.  ECF No. 62 ¶ 68.  Deputy J. Snyder similarly ordered Plaintiff to get on the ground and show his hands.  *Id.* ¶ 69.  Plaintiff disputes he was given these commands and maintains that there were flashlights pointed at him, which caused him to lower his hands to shield his eyes, and he was unable to understand what the officers were saying. ECF Nos. 62 ¶¶ 72-73; 94 ¶ 175.  The officers observed Plaintiff advancing towards Sergeant Combs.  ECF Nos. 62 ¶¶ 66, 71;

63-3 at 9-10; 64 ¶ 16. Plaintiff adamantly denies any advancement.[6] ECF Nos. 62 ¶ 66; 63-4 at 8; 72 ¶ 36. Although the video footage from Sergeant Combs' taser is not entirely clear, it shows Plaintiff beyond the threshold of the door towards the officers, which shows there was an advancement. *See* ECF No. 104.

Allegedly in response to the perceived threat posed by Plaintiff, Sergeant Combs deployed his taser in dart mode at Plaintiff. ECF Nos. 62 ¶ 76; 63-4 at 8; 72 ¶ 36; 94 ¶ 188, 193. Deputy G. Snyder also shot his taser at Plaintiff, which firing was ineffective. ECF No. 62 ¶ 78. The officers did not warn Plaintiff that they were going to deploy their tasers, ECF No. 94 ¶ 195; however the officers contend they were shouting commands at Plaintiff, commands which Plaintiff failed to obey, ECF No. 62 ¶ 70. Plaintiff swore at the officers, brushed off several of the probes, and attempted to close the door. ECF Nos. 62 ¶ 76; 72 ¶ 36; 94 ¶¶ 192-196. Plaintiff admits that only one dart from Sergeant Combs' taser

---

[6] Sergeant Combs' police report suggests that he deployed his Taser in response to Plaintiff's "refus[al] to listen to anything [the officers] had to say," and continual yelling. ECF No. 93-5 at 83. The report makes no mention of Plaintiff advancing toward Sergeant Combs, or Sergeant Combs fearing an imminent attack. *Id.* Deputy G. Snyder's report, however, notes that Plaintiff "was screaming and cursing and began to come towards Sgt. Combs as if he wanted to fight him." ECF No. 64-2 at 2.

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT ~ 10

application hit him, and he does not recall feeling any electrical current or charge as a result. ECF Nos. 62 ¶ 80; 63-4 at 9; 72 ¶ 85. Before Plaintiff could completely close the door on the officers, Sergeant Combs shoved the door open with enough force to throw Plaintiff to the other side of the mudroom.[7] ECF Nos. 62 ¶ 82; 94 ¶ 196.

Once inside the house, the County deputies observed Plaintiff swinging his fists and attacking Sergeant Combs. ECF Nos. 62 ¶ 91; 72 ¶ 38, 93; 94 ¶¶ 198-200. Plaintiff disputes that he "rushed" at Sergeant Combs and swung "both his arms;" however, he does not rebut the assertion that the County deputies observed him attacking Sergeant Combs. *See* ECF Nos. 94 at 198; 95; 96. Deputy J. Snyder tackled Plaintiff, and while Plaintiff was on the ground, Sergeant Combs drive stunned Plaintiff multiple times in his upper right shoulder. ECF Nos. 62 ¶ 84; 72 ¶¶ 38-39; 94 ¶ 202. Eventually all three officers were holding Plaintiff to the ground. ECF No. 62 ¶¶ 95-97. Plaintiff continued to resist, even after Deputy J. Snyder handcuffed him. ECF Nos. 62 ¶ 98-99; 72 ¶ 39; 94 ¶ 212-213. Plaintiff concedes that he continued to struggle throughout the altercation and can be heard in the taser video—in response to an officer's repeated commands to "give [the officer his] hands" and "hold still"—asserting "no," "why," and "why are you in

---

[7] The parties and witnesses variously label this small room inside the back door as the back porch or mudroom.

my house?".  ECF Nos. 63-4 at 9; 105.  Sergeant Combs deployed his taser in drive

stun mode once more after Plaintiff was handcuffed and continued to resist.  ECF

No. 72 ¶ 39.  Sergeant Comb's taser report shows his taser was activated in drive

stun mode four times within approximately one minute.[8]  ECF No. 94 ¶ 211; *see*

ECF No. 93-1 at 3-8.  Plaintiff was then placed under arrest for assault on an

officer, resisting arrest, and domestic violence assault in the fourth degree.  ECF

No. 72 ¶ 43.

   After his arrest, Plaintiff was transported to the Asotin County Jail.  The

Asotin County Jail has a total of 52 beds, with the bunks in each cell either made

of concrete or steel.  ECF No. 62 ¶¶ 114-115.  The floors of each cell are similarly

made of concrete.  *Id.* ¶ 116.  According to County Deputy Shawn Rudy, the jail

often runs at capacity and there is not always adequate bunk space for each

detainee.  *Id.* ¶ 117.  Upon booking, each detainee receives several bedding items,

including a sheet, blanket, and mattress, and personal hygiene items.  *Id.* ¶ 118.

---

[8] As a result of these Taser applications Plaintiff claims the following physical and

emotional injuries: (1) a lasting freckle where the dart hit him from Sergeant

Combs first Taser application; (2) week-long soreness in his shoulder and a "burn

of sorts" following the incident; (3) long-lasting emotional harm, including distrust

of law enforcement, nightmares, flashbacks, elevated stress, and unhappiness.

ECF Nos. 62 ¶¶ 110-111; 63-4 at 12-13.

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT ~ 12

Male detainees do not receive toilet paper upon booking, the rationalization being

many detainees do not remain long enough to need any toilet paper and excess

toilet paper can be fashioned into a weapon or used to clog the plumbing in cells.

*Id.* ¶ 120.  That being said, a detainee can request toilet paper from staff.  *Id.* ¶ 122.

Toilet paper is kept on the medical cart which circulates the facility at least four

times a day.  *Id.* ¶ 123.  Staff can also access toilet paper at the end of each tier of

cells upon request.  *Id.* ¶ 124.  Finally, detainees can request toilet paper by

submitting a "kite" or electronic message to staff through the kiosk available in the

common area. *Id.* ¶ 126.

Plaintiff arrived at the Asotin County Jail at approximately 2:36 a.m. on the

morning of January 8, 2012.  *Id.* ¶ 129.  Upon booking, Plaintiff received a cup,

toothbrush, toothpaste, a sheet, a blanket, and a mattress with a built-in pillow.

ECF Nos. 62 ¶ 131; 63-5 at 1.  Plaintiff was then assigned to a cell which had a

bunk bed and two other detainees already assigned to it.  ECF No. 62 ¶ 136.

Plaintiff was instructed to sleep on the floor.  ECF Nos. 62 ¶ 140; 94 ¶ 226.

During the time that Plaintiff was in custody, all of the other general population

cells had, at some point in time, three detainees per cell.  ECF No. 62 ¶ 144; *see*

ECF No. 63-2.

The following morning, Plaintiff had the urge to defecate.  ECF Nos. 62 ¶

146, 148; 94 ¶ 227.  Plaintiff requested toilet paper from a jail employee, who

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT ~ 13

responded to the effect that Plaintiff would "get some at some point."  ECF Nos.

62 ¶ 150; 63-5 at 5.  Plaintiff went to indoor recreation at approximately 7:39 a.m.,

but did not request toilet paper at this time, nor did Plaintiff request toilet paper

during lunch.  ECF Nos. 62 ¶ 152; 63-5 at 5.  Plaintiff asserts that one of his cell

mates requested toilet paper on three separate occasions after lunch to no avail.

ECF Nos. 62 ¶ 155; 63-3 at 5.  Plaintiff received a roll of toilet paper at

approximately 6:43 p.m.  ECF No. 62 ¶ 158.  Plaintiff had only one bowel moment

while in custody and this was after he received toilet paper.[9]  *Id.* ¶ 160.  Plaintiff

was released from custody at approximately 4:11 p.m. on January 9.  *Id.* ¶ 172.

## DISCUSSION

### I.    Motions for Summary Judgment

Summary judgment may be granted to a moving party who demonstrates

"that there is no genuine dispute as to any material fact and the movant is entitled

to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the

initial burden of demonstrating the absence of any genuine issues of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The burden then shifts to the

non-moving party to identify specific facts showing there is a genuine issue of

---

[9] As a result of this delayed receipt, Plaintiff complains that he experienced

clenching, gut cramps, and discomfort; however, he never reported any discomfort

to jail staff.  ECF No. 62 ¶¶ 161, 163.

material fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

"The mere existence of a scintilla of evidence in support of the plaintiff's position

will be insufficient; there must be evidence on which the [trier-of-fact] could

reasonably find for the plaintiff." *Id.* at 252.

For purposes of summary judgment, a fact is "material" if it might affect the

outcome of the suit under the governing law. *Id.* at 248. A dispute concerning any

such fact is "genuine" only where the evidence is such that the trier-of-fact could

find in favor of the non-moving party. *Id.* "[A] party opposing a properly

supported motion for summary judgment may not rest upon the mere allegations or

denials of his pleading, but must set forth specific facts showing that there is a

genuine issue for trial." *Id.*(internal quotation marks omitted); *see also First Nat'l

Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968) (holding that a party

is only entitled to proceed to trial if it presents sufficient, probative evidence

supporting the claimed factual dispute, rather than resting on mere allegations).

Moreover, "[c]onclusory, speculative testimony in affidavits and moving papers is

insufficient to raise genuine issues of fact and defeat summary judgment.

*Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). In ruling

upon a summary judgment motion, a court must construe the facts, as well as all

rational inferences therefrom, in the light most favorable to the non-moving party,

*Scott v. Harris*, 550 U.S. 372, 378 (2007), and only evidence which would be

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT ~ 15

admissible at trial may be considered, *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002).

### A. Section 1983 Claims

Plaintiff alleges several causes of action under 42 U.S.C. § 1983: unreasonable warrantless search and entry, excessive force, unlawful warrantless arrest, pretrial detention that amounts to punishment, and conspiracy. A cause of action pursuant to section 1983 may be maintained "against any person acting under color of law who deprives another 'of any rights, privileges, or immunities secured by the Constitution and laws' of the United States." *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 887 (9th Cir. 2003) (quoting 42 U.S.C. § 1983). The rights guaranteed by section 1983 are "liberally and beneficently construed." *Dennis v. Higgins*, 498 U.S. 439, 443 (1991) (quoting *Monell v. N.Y. City Dep't of Soc. Servs.*, 436 U.S. 658, 684 (1978)).

Here, there is no dispute that the officers acted under the color of law; thus, the only question is whether they violated Plaintiff's constitutional rights.

### B. Unreasonable Search

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. In light of this fundamental right, "searches and

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT ~ 16

seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980).

### 1. Warrantless Entry to the Curtilage of Plaintiff's Property

Plaintiff first claims that his constitutional rights were violated when the officers entered the curtilage of his home without a warrant. "The presumptive protection accorded people at home extends to outdoor areas traditionally known as 'curtilage'—areas that, like the inside of a house, 'harbor the intimate activity associated with the sanctity of a person's home and the privacies of life.'" *United States v. Struckman*, 603 F.3d 731, 738 (9th Cir. 2010) (quoting *United States v. Dunn*, 480 U.S. 294, 300 (1987)); *see also Florida v. Jardines*, 133 S.Ct. 1409, 1414 (2013) ("We therefore regard the area immediately surrounding and associated with the home—what our cases call the curtilage—as part of the home itself for Fourth Amendment purposes." (internal quotation marks and citation omitted)); *Oliver v. United States*, 466 U.S. 170, 180 (1984) ("[A]n individual reasonably may expect than an area immediately adjacent to a home will remain private.").

Nonetheless, the Ninth Circuit has repeatedly held that "law enforcement officers may encroach upon the curtilage of a home for the purpose of asking questions of the occupants." *United States v. Perea-Rey*, 680 F.3d 1179, 1187 (9th Cir. 2012) (quoting *United States v. Hammett*, 236 F.3d 1054, 1059 (9th Cir.

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT ~ 17

2001)).  The so-called "knock and talk" doctrine permits officers to approach a

home to contact the inhabitants even though such entry may impose upon the

protected curtilage of one's home.  *Id.*  "The constitutionality of such entries into

the curtilage hinges on whether the officer's actions are consistent with an attempt

to initiate consensual contact with the occupants of the home."  *Id.* at 1188.

> An officer may approach any entry accessible to the public:
>
> The law does not require an officer to determine which door most
> closely approximates the Platonic form of "main entrance" and then,
> after successfully completing this metaphysical inquiry, approach only
> that door.  An officer initiating a "knock and talk" visit may approach
> any part of the building where uninvited visitors could be expected.

*Id.* (internal quotation marks and citation omitted).  Indeed, the Ninth Circuit,

relying upon extra-circuit case law, noted that an officer proceeding to an

alternative entry after receiving no response at the initial door is not "so

incompatible with the scope of [the officer's] original purpose" in attempting

contact.  *Hammett*, 236 F.3d at 1060, *overruled on other grounds by Perea-Rey*,

680 F.3d 1179.  After all, "[t]he scope of a license—express or implied—is limited

not only to a particular area but also to a specific purpose."  *Jardines*, 133 S.Ct. at

1416.  That being said, "once an attempt to initiate a consensual encounter with the

occupants of a home fails, the officers should end the knock and talk and change

their strategy by retreating cautiously, seeking a search warrant, or conducting

further surveillance." *Perea-Rey,* 680 F.3d at 1188 (internal quotation marks and citation omitted).

Here, there is no genuine dispute that the City officers did not violate Plaintiff's Fourth Amendment rights when they, after first speaking with the witnesses, encroached upon the curtilage of Plaintiff's home in an effort to contact Plaintiff. Although Plaintiff asserts that Sergeant Combs went beyond the scope of the "knock and talk" exception when he proceeded to knock on several doors and windows—as well as look through the windows with the assistance of a flashlight—after Plaintiff made no response to the initial attempt at the front door, Sergeant Combs' purpose remained the same throughout: he was attempting to contact Plaintiff. Thus, the scope of the officers' license to encroach upon the curtilage of Plaintiff's home was limited to the specific purpose of making contact with Plaintiff. *See Jardines,* 133 S.Ct. at 1416; *Hammett,* 236 F.3d at 1060. Accordingly, because the undisputed facts show that the officers did not exceed this scope, this Court finds summary judgment in favor of Defendants is appropriate on this claim.

2. Warrantless Entry to Plaintiff's Home

Plaintiff next contends that the officers violated his constitutional rights when they encroached upon his curtilage a second time and ultimately entered his home without a warrant. The "physical entry of the home is the chief evil against

which the wording of the Fourth Amendment is directed." *Payton v. New York*, 445 U.S. 573, 584 (1980) (quoting *United States v. U.S. Dist. Court for E. Dist. of Mich.*, 407 U.S. 297, 313 (1972)).  Although the Fourth Amendment presumes as unreasonable the warrantless entry of a person's home, "[t]his presumptive Fourth Amendment protection 'is not irrebuttable.'" *Struckman*, 603 F.3d at 738 (quoting *Hopkins v. Bonvicino*, 573 F.3d 752, 763 (9th Cir. 2009)).

The officers' actions are entitled to a qualified immunity analysis.  Qualified immunity shields government actors from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.*

In evaluating a state actor's assertion of qualified immunity, a court must determine (1) whether the facts, viewed in the light most favorable to the plaintiff, show that the defendant's conduct violated a constitutional right; and (2) whether the right was clearly established at the time of the alleged violation such that a reasonable person in the defendant's position would have understood that his actions violated that right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in*

*part by Pearson*, 555 U.S. 223.  To determine whether a right is "clearly

established," courts consider the following:

> [The contours of the right] must be sufficiently clear that a reasonable
> official would understand that what he is doing violates that right.
> This is not to say that an official action is protected by qualified
> immunity unless the very action in question has previously been held
> unlawful; but it is to say that in the light of pre-existing law the
> unlawfulness must be apparent.

*Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (internal citations omitted).  A court

may, within its discretion, decide which of the two prongs should be addressed first

in light of the particular circumstances of the case.  *Pearson*, 555 U.S. at 236.  If

the answer to either inquiry is "no," then the defendant is entitled to qualified

immunity and may not be held personally liable for his or her conduct.  *Glenn v.

Wash. Cnty.*, 673 F.3d 864, 870 (9th Cir. 2011).

When determining whether there are any genuine issues of material fact at

the summary judgment stage in the context of qualified immunity, "determinations

that turn on questions of law, such as whether the officers had probable cause or

reasonable suspicion to support their actions, are appropriately decided by the

court."  *Hopkins*, 573 F.3d at 763 (citing *Act Up!/Portland v. Bagley*, 988 F.2d

868, 873 (9th Cir. 1993)).  "However, a trial court should not grant summary

judgment when there is a genuine dispute as to the 'facts and circumstances within

an officer's knowledge' or 'what the officer and claimant did or failed to do.'"  *Id.*

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT ~ 21

a. *Consent*

First, this Court considers whether the officers had valid consent to enter Plaintiff's home without a warrant, thus justifying their warrantless entry to Plaintiff's home. "To the Fourth Amendment rule ordinarily prohibiting the warrantless entry of a person's house as unreasonable *per se*, one jealously and carefully drawn exception recognizes the validity of a search with the voluntary consent of an individual possessing authority." *Georgia v. Randolph*, 547 U.S. 103, 109 (2006) (internal quotation marks and citations omitted). The consenting person may merely be a fellow occupant "whom the police reasonably, but erroneously, believe to possess shared authority as an occupant." *Id.* In *Randolph*, the Court announced its limited holding that, in the context of warrantless searches, "a physically present co-occupant's stated refusal to permit entry prevails, rendering the warrantless search unreasonable and invalid as to him." *Id.* at 106; *see also id.* at 120 ("We therefore hold that a warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as unreasonable as to him on the basis of consent given to the police by another resident."). This holding represents a "narrow exception" to the rule that "police officers may search jointly occupied premises if one of the occupants consents." *Fernandez v. California*, 134 S.Ct. 1126, 1129 (2014).

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT ~ 22

The issue here is what constitutes "express" or "stated" refusal for purposes of invalidating the consent of a co-occupant.  In *United States v. Moore*, the Ninth Circuit declined to extend *Randolph's* ruling to "implicit refusals."  770 F.3d 809, 813 (9th Cir. 2014).  In *Moore*, the defendant, after consent to enter was provided to officers by a co-tenant, merely barricaded himself in his residence: "he did not respond to the police officers' 'knock and talk' at 2:00 p.m.; he did not answer [his fiancée's] phone calls; and he did not open the door for his [fiancée] when she, accompanied by police officers, knocked on the door at approximately 8:45 p.m." *Id.*  Focusing on this conduct, the Ninth Circuit held that the defendant never expressly refused the search but merely "acquiesced in letting his fiancée deal with the police." *Id.*

In so holding, the Ninth Circuit distinguished a similar Eighth Circuit case finding the opposite.  In *United States v. Williams*, after obtaining consent from a co-occupant, officers went to a hotel room and knocked.  521 F.3d 902, 905 (8th Cir. 2008).  When there was no response, the officers proceeded to open the door with the hotel manager's key.  *Id.*  After a brief exchange between the occupant and the officers, the door was immediately slammed shut and dead-bolted by the occupant.  *Id.* The Eighth Circuit found this conduct sufficient to invalidate the co-occupant's consent.  *Id.*  In distinguishing the facts in *Williams* from the facts in *Moore*, the Ninth Circuit reasoned that unlike the defendant in *Williams*, the

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT ~ 23

defendant in *Moore* neither communicated with the police officers nor engaged in any affirmative conduct to physically prevent the police officers from entering; rather, he simply remained in the house. *Moore*, 770 F.3d at 814. Such "[a]cquiescence is insufficient to overcome the narrow exception in *Randolph*." *Id.*

This Court finds a genuine issue remains as to whether Plaintiff's actions were sufficient to invalidate Ms. Ausman's consent to enter. On the one hand, Plaintiff did not, in words, communicate his "express" or "stated" objection to the officers' entry once he was aware that there were officers outside and that they had the intent to enter. Like the defendant in *Moore*, Plaintiff remained barricaded within the house, thus acquiescing to the consent the officers obtained from Ms. Ausman—consent that was given after Plaintiff had locked all the doors to the house and remained non-responsive inside. Furthermore, Plaintiff testified that he did not even know that it was the police knocking on his doors until after he locked the side door. ECF No. 63-4 at 5 ("Q: After a bit, I got up and I could see someone coming to the side door, and I realized that [it] was unlocked. So I locked it. And that's when I realized it was the police."). On the other hand, Plaintiff, like the defendant in *Williams*, locked the side door when Sergeant Combs approached, which arguably conveyed the message that he objected to his entry, along with any others outside, whether or not he knew at that moment they were law enforcement officials. Sergeant Combs heard the door lock as he approached and understood

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT ~ 24

this conduct to mean that Plaintiff did not wish to speak with him.  Although

Plaintiff's conduct could be construed as a mere implicit refusal to the officers'

entry, thus falling short of the "express" or "stated" refusal necessarily required by

*Randolph's* holding, such affirmative conduct could be viewed as sufficient to

invalidate Ms. Ausman's subsequent consent.

Even if Plaintiff's conduct was sufficient to invalidate Ms. Ausman's

consent, the officers are entitled to qualified immunity.  In regards to the consent

exception, at the time of the incident in 2012, the Supreme Court's opinion in

*Georgia v. Randolph* had established the general proposition that a warrantless

entry or search of a shared dwelling "over the express refusal of consent by a

physically present resident" violates the Fourth Amendment .  547 U.S. at 120.

However, the contours of the right—namely, what conduct would and would not

constitute "express" or "stated" refusal—were not clearly established in *Randolph*.

*See Saucier,* 533 U.S. at 201-02.  As evidenced by the arguable disjointedness

between the Eighth Circuit's opinion in *Williams* and the Ninth Circuit's opinion in

*Moore* which both post-dated *Randolph*, the meaning of "express"  or "stated" was

not precisely defined.  Furthermore, the Court in *Randolph*, in an effort to grapple

with the holding's effect on the unique circumstance of officers responding to

domestic violence and being refused admittance by the objecting aggressor,

highlighted that its holding is limited to "merely evidentiary searches" and would

not "compromise [law enforcement's] capacity to protect a fearful occupant" in a

domestic violence case:

> [T]his case has no bearing on the capacity of the police to protect domestic victims. The dissent's argument rests on the failure to distinguish two different issues: when the police may enter without committing a trespass, and when the police may enter to search for evidence. No question has been raised, or reasonably could be, about the authority of the police to enter a dwelling to protect a resident from domestic violence; so long as they have good reason to believe such a threat exists, it would be silly to suggest that the police would commit a tort by entering, say, to give a complaining tenant the opportunity to collect belongings and get out safely, or to determine whether violence (or threat of violence) has just occurred or is about to (or soon will) occur, however much a spouse or other co-tenant objected.

*Randolph,* 547 U.S. at 118.  Although the Court's reasoning, *in dicta*, applies to the

situation where there is a risk of harm to the co-occupant who remains unprotected

inside the house, its explanation is not a model of clarity and thus did little to help

establish the "contours of the right."

Here, this Court finds Plaintiff's right was not so clearly established that a

reasonable officer, in the shoes of the County and City officers, would have known

his conduct was unlawful.  Rather, when the officers entered Plaintiff's house, the

Supreme Court's opinion in *Randolph* established only the general proposition that

law enforcement could search Plaintiff's home with the consent of a co-occupant

unless Plaintiff, physically present, made an "express" or "stated" objection.

However, the contours of this right—specifically, what constitutes "express" or

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT ~ 26

"stated" refusal and whether *Randolph's* limited holding regarding searches applies in the specific context of this case where officers were attempting to contact Plaintiff—were not.  Plaintiff did not come to the door and windows to communicate with the officers; rather, he secreted himself within the house.  The only conduct on Plaintiff's part that may come anywhere close to satisfying *Randolph's* standard was locking the side door as Sergeant Combs approached.  However, after Ms. Ausman gave consent to enter, Plaintiff simply remained in the house, unwilling to communicate.  An officer reasonably could have assumed this conduct did not constitute an express or stated refusal and was insufficient to invalidate Ms. Ausman's consent.  Looking at the undisputed facts, a reasonable officer, under these circumstances, would not have *known* he lacked consent to enter Plaintiff's home without a warrant.  Accordingly, the officers are entitled to qualified immunity and summary judgment on this claim is appropriate.

### b. Emergency Doctrine

Second, this Court considers whether the emergency doctrine also provided justification to the officers' warrantless entry.   This exception is "narrow" and its boundaries "rigorously guarded" in order "to prevent any expansion that would unduly interfere with the sanctity of the home." *Hopkins* , 573 F.3d at 763.  "The 'emergency' exception stems from the police officers' 'community caretaking function' and allows them 'to respond to emergency situations' that threaten life or

limb." *Id.* To determine whether the emergency exception applies, courts look to the totality of the circumstances to determine whether officers had "an *objectively reasonable basis* for concluding that there [was] an immediate need to protect others or themselves from harm." *Id.* at 764 (quoting *United States v. Snipe*, 515 F.3d 947, 951 (9th Cir. 2008)). Specific to the situation where officers are responding to a domestic violence call, the Ninth Circuit has repeatedly highlighted "the unique context of a domestic abuse call, in which violence may be lurking and explode with little warning." *Id.* at 766 (internal quotation marks and citation omitted). For instance, in *United States v. Martinez*, the Ninth Circuit upheld the officers' warrantless entry to speak to the screaming and potentially injured male resident where the officers were responding to a domestic violence call and found a woman crying on the front lawn in front of the house. 406 F.3d 1160, 1162-64 (9th Cir. 2005).

Relevant to the qualified immunity analysis, the Supreme Court's opinion in *Brigham City v. Stuart* clearly established that at the time of entry, a police officer must have "objectively reasonable" grounds to believe there is an emergency at hand obviating the need for a warrant. 547 U.S. 398, 403 (2006). "An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed *objectively*, justify the action.'" *Id.* at 404 (quoting *Scott v. United States*, 436 U.S. 128, 138 (1978)); *see*

*also Hopkins,* 573 F.3d at 763-64 ("'[L]aw enforcement must have an *objectively reasonable basis* for concluding that there is an immediate need to protect others or themselves from serious harm.'" (quoting *Snipe*, 515 F.3d at 951)).  Thus, for purposes of determining qualified immunity, the court then asks "whether [at the time of the events in question] a *'reasonable officer' would have known* that he lacked 'reasonable grounds to believe that there was an emergency at hand.'" *Hopkins*, 573 F.3d at 771 (quoting *Saucier v. Katz*, 533 U.S. at 202); *Stanton v. Sims*, 134 S.Ct. 3, 7 (2013) (officer "may have been mistaken in believing his actions were justified, but he was not plainly incompetent") (internal quotation and citation omitted).

Whether or not the officers violated Plaintiff's Fourth Amendment rights by entering his home without a warrant in excess of the emergency exception, looking at the undisputed facts, the officers are entitled to qualified immunity.  Here, this Court finds, in light of the undisputed facts, no reasonable officer in the shoes of the County and City officers would have known his conduct was unlawful.  First, when the City officers arrived at Plaintiff's residence, they knew they were responding to a report of physical domestic violence, a potentially volatile environment.  When they arrived, they saw several people standing outside, including Ms. Ausman, who was visibly upset and emotional.  Second, although the precise information relayed to the officers is in dispute, Plaintiff cannot

genuinely dispute that both the female and male narratives relayed that there had been an argument between Ms. Ausman and Plaintiff in which Ms. Ausman had threatened to leave with their child and Plaintiff had either attempted to throw Ms. Ausman to the ground before being tackled or actually threw Ms. Ausman to the ground.  Third, although Ms. Ausman told the officers that Plaintiff did not have a firearm and that she did not believe he posed a danger to himself, she also told the officers that Plaintiff was highly volatile and acting unlike himself.  Fourth, the officers knew, either because of what Ms. Ausman told them or based on their own observations, that the group had been drinking and that alcohol was a factor. Finally, the officers, in their experience, understood that obtaining a warrant at 2 a.m. would take some time and, during any delay, the only officers on patrol for both the City and County would be at Plaintiff's home.

Based on the totality of the uncontroverted circumstances, no reasonable officer would have *known* he lacked enough objectively reasonable grounds to enter Plaintiff's home without a warrant.  Accordingly, the officers are entitled to qualified immunity and summary judgment on this claim is appropriate.

3. Municipal Liability

Plaintiff also directs his warrantless entry claim against the City of Clarkston and Asotin County.  The Supreme Court has held that local governments are "persons" who may be subject to suits under § 1983.  *Monell v. Dep't of Soc.*

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT ~ 30

*Servs.*, 436 U.S. 658, 690 (1978).  However, a municipality may only be held liable for constitutional violations resulting from actions undertaken pursuant to an "official municipal policy."  *Id.* at 691.  As the Supreme Court articulated in *Monell*, the purpose of the "official municipal policy" requirement is to prevent municipalities from being held vicariously liable for unconstitutional acts of their employees under the doctrine of respondeat superior.  *Id.*; *see also Bd. of Cnty. Comm'rs  v. Brown*, 520 U.S. 397, 403 (1997); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478-79 (1986).  Thus, the "official municipal policy" requirement "distinguish[es] acts of the *municipality* from acts of *employees* of the municipality, and thereby make[s] clear that municipal liability is limited to action for which the municipality is actually responsible."  *Pembaur*, 475 U.S. 469, 479-80 (1986) (emphasis in original) (footnote omitted).

The Ninth Circuit recognizes four categories of "official municipal policy" sufficient to establish municipal liability under *Monell*: (1) action pursuant to an express policy or longstanding practice or custom; (2) action by a final policymaker acting in his or her official policymaking capacity; (3) ratification of an employee's action by a final policymaker; and (4) failure to adequately train employees with deliberate indifference to the consequences.  *Christie v. Iopa*, 176 F.3d 1231, 1235-40 (9th Cir. 1999).  A plaintiff must also establish the requisite causal link between this "policy" and the alleged constitutional deprivation.  *See*

*Harper v. City of L.A.*, 533 F.3d 1010, 1026 (9th Cir. 2008).  The Supreme Court

articulated the causation requirement as follows:

> [I]t is not enough for a § 1983 plaintiff merely to identify conduct
> properly attributable to the municipality. The plaintiff must also
> demonstrate that, through its deliberate conduct, the municipality was
> the "moving force" behind the injury alleged.  That is, a plaintiff must
> show that the municipal action was taken with the requisite degree of
> culpability and must demonstrate a direct casual link between the
> municipal action and the deprivation of federal rights.

*Bd. of Cnty. Comm'rs*, 520 U.S. at 404.  "Where a plaintiff claims that the

municipality has not directly inflicted an injury, but nonetheless has caused an

employee to do so, rigorous standards of culpability and causation must be applied

to ensure that the municipality is not held liable solely for the actions of its

employees."  *Id.* at 405.

     *a.  City of Clarkston*

Even assuming the City officers violated Plaintiff's Fourth Amendment

rights when they entered his home without a warrant, this Court finds that Plaintiff

has failed to present sufficient evidence to establish municipal liability and

overcome summary judgment as to his warrantless entry claim against the City of

Clarkston.  Plaintiff's briefing asserts municipal liability under the theory of

ratification only.

The City cannot be held liable under the theory of ratification.  Joel

Hastings, the Chief of Police for the City of Clarkston, reviewed the officer

reports, per routine, and spoke with Sergeant Combs following the incident.  ECF No. 93-10 at 7-9.  In response to questioning at his deposition, Chief Hastings testified that he approved of the officers' actions.  *Id.* at 10.  Beyond this statement, Plaintiff asserts no allegations, nor provides any evidence, that Ms. Hastings ratified the City officers' actions following the incident—the evidence presented merely shows that Chief Hastings had limited knowledge of the incident based on Sergeant Combs' report and statements made to him by Sergeant Combs.  *See Christie*, 176 F.3d at 1235-40 (knowledge of an unconstitutional act is not enough to constitute ratification, rather "a plaintiff must prove that the policymaker approved of the subordinate's act").  Similarly, the mere fact that Sergeant Combs was not disciplined for his warrantless entry is insufficient.  *Haugen v. Brosseau*, 339 F.3d 857, 875 (9th Cir. 2003) (holding that a "single failure to discipline" does not provide a basis to impose the ratification doctrine), *rev'd on other grounds by Brosseau v. Haugen*, 543 U.S. 194 (2004).

Even if Plaintiff were able to demonstrate the conduct of the City officers was pursuant to a policy of the City, he has failed to demonstrate that the City was the "moving force" or otherwise provide evidence of a causal link between the City's action and the deprivation of his rights.  Rather, Plaintiff alleges that it was the individual actions of the officers who made a warrantless entry to his home.  *See Bd. of Cnty. Comm'rs*, 520 U.S. at 406-07 ("That a plaintiff has suffered a

deprivation of federal rights at the hands of a municipal employee will not alone permit an inference of municipal culpability and causation; the plaintiff will simply have shown that the employee acted culpably.").

Accordingly, even if the officers had violated Plaintiff's constitutional rights when they entered his home without a warrant, the Court finds no reasonable jury could find the alleged constitutional violation was undertaken pursuant to "official municipal policy." Therefore, Plaintiff's warrantless entry claim, as applied to the City of Clarkston, is dismissed.

### b. Asotin County

Even assuming the County officers violated Plaintiff's Fourth Amendment rights when they entered his home without a warrant, this Court finds that Plaintiff has failed to present sufficient evidence to establish municipal liability and overcome summary judgment as to his warrantless entry claim against Asotin County. Plaintiff's briefing asserts municipal liability under the theory of ratification and failure to adequately train.

First, the County cannot be held liable under the theory of ratification. Grove Kenneth Bancroft served as Sheriff for Asotin County from January 2007 to August 2014. In response to questioning at his deposition, Sheriff Bancroft testified that, based on his limited knowledge of what transpired on January 8, 2012, he approved of the deputies' decisions. ECF No. 93-9 at 4-5. Although

Sheriff Bancroft read Deputy Snyder's report, he did not conduct an investigation or direct anyone else to conduct an investigation of the incident, had no personal knowledge of what happened, and did not discuss the incident with the deputies. Just as this approval was insufficient to hold the City of Clarkston liable, these statements approving of the deputies' conduct—statements made in response to questioning after this litigation commenced—do not amount to ratification.

Second, the County is not liable under a theory of failure to train. "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 131 S.Ct. 1350, 1359 (2011). A court may find a failure to train when "the need for more or different training is *so obvious* and the inadequacy *so likely* to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989) (emphasis added). This deliberate indifference standard requires the plaintiff show the municipality was "on actual or constructive notice that its omission would likely result in a constitutional violation." *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1145 (9th Cir. 2012) (quoting *Gibson v. Cnty. of Washoe*, 290 F.3d 1175, 1186 (9th Cir. 2002)). A "'pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference.'" *Id.* (quoting *Connick*, 131 S.Ct. at 1360).

Plaintiff has neither shown that Asotin County had actual notice of any flaw in its policy, nor has Plaintiff shown that any training deficiency was "so obvious" that it amounted to deliberate indifference.  Moreover, Plaintiff has failed to present a pattern of similar constitutional violations by untrained employees. In support of this theory, Plaintiff asserts Asotin County's training is deficient in two areas: constitutional rights of citizens against police misconduct and the use of force against citizens.  However, beyond faulting the County for not offering any courses that review relevant case law on these topics or provide instruction on the County's written policy regarding use of force, ECF No. 91 at 23-24, Plaintiff has presented no evidence of deficient training.

Even if Plaintiff were able to demonstrate the conduct of the County deputies was pursuant to policy of the County, he has failed to demonstrate that the County was the "moving force" or otherwise provide evidence of a causal link between the County's action and the alleged deprivation of his rights.  Rather, Plaintiff alleges that it was the individual actions of the deputies who made a warrantless entry to his home.  *See Bd. of Cnty. Comm'rs*, 520 U.S. at 406-07 ("That a plaintiff has suffered a deprivation of federal rights at the hands of a municipal employee will not alone permit an inference of municipal culpability and causation; the plaintiff will simply have shown that the employee acted culpably.").

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT ~ 36

Accordingly, even if the officers had violated Plaintiff's constitutional rights when they entered his home without a warrant, the Court finds no reasonable jury could find the alleged constitutional violation was undertaken pursuant to "official municipal policy." Therefore, Plaintiff's warrantless entry claim, as applied to Asotin County, is dismissed.

### C. Conspiracy under 42 U.S.C. 1983[10]

Plaintiff contends that the officers conspired to deprive him of his constitutional rights when they developed a plan to make a warrantless entry to his house. To prove conspiracy under section 1983, a plaintiff must show "an agreement or meeting of minds" to violate his constitutional rights. *Woodrum v. Woodward Cnty.*, 866 F.2d 1121, 1126 (9th Cir. 1989). "To be liable, each participant in the conspiracy need not know the exact details of the plan, but each participant must at least share the common objective of the conspiracy." *United Steelworkers of Amer. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1540-41 (9th Cir. 1989) (en banc).

This Court finds no reasonable jury could conclude that Defendants conspired to deprive Plaintiff of his constitutional rights. The sole basis for Plaintiff's conspiracy claim is that Defendants, when they developed a plan to enter his home without a warrant, conspired to violate his rights. ECF No. 92 at

---

[10] Plaintiff abandoned his 42 U.S.C. § 1985 claim. ECF No. 92 at 18-19.

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT ~ 37

18.  This Court found that even if Defendants violated Plaintiff's Fourth

Amendment rights when they entered his home without a warrant, they

undoubtedly had qualified immunity under both the consent and emergency

exceptions.  Accordingly, Plaintiff's conspiracy claim fails.

### D. Excessive Force

Plaintiff also contends that the officers used excessive force when they

arrested him.  Claims of excessive force are analyzed under the Fourth

Amendment, which protects persons from unreasonable seizures.  *Graham v.*

*Connor*, 490 U.S. 386, 394-95 (1989).  In evaluating a Fourth Amendment claim

of excessive force under 42 U.S.C. § 1983, courts must determine "whether the

officers' actions are 'objectively reasonable' in light of the facts and circumstances

confronting them."  *Id.* at 397.  This inquiry "requires a careful balancing of the

nature and quality of the intrusion on the individual's Fourth Amendment interests

against the countervailing governmental interests at stake."  *Id.* at 396 (quotation

and citation omitted).

> Because the test of reasonableness under the Fourth Amendment is
> not capable of precise definition or mechanical application . . . its
> proper application requires careful attention to the facts and
> circumstances of each particular case, including the severity of the
> crime at issue, whether the suspect poses an immediate threat to the
> safety of the officers or others, and whether he is actively resisting
> arrest or attempting to evade arrest by flight.

*Id.* (quotation and citation omitted); *see Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) ("[T]he most important *Graham* factor is whether the suspect posed an immediate threat to the safety of the officers or others.") (internal quotations and citations omitted).  This calculus must account for the fact that police officers are often "forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97.  Consequently, the objective reasonableness of an officer's use of force must be judged from the perspective of a reasonable officer on the scene, "rather than with the 20/20 vision of hindsight." *Id.* at 396 (citing *Terry v. Ohio*, 392 U.S. 1, 20-22 (1968)).  At bottom, the question is whether the officer's actions were objectively reasonable in light of the facts and circumstances confronting him or her.  *Id.* at 397.

Determining whether an officer's force was excessive or reasonable "requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id.* at 396.  Courts in the Ninth Circuit follow a three-step analysis when considering the reasonableness of an officer's use of force:

> First, we must assess the severity of the intrusion on the individual's Fourth Amendment rights by evaluating the type and amount of force inflicted.  Next, we must evaluate the government's interests by assessing (1) the severity of the crime; (2) whether the suspect posed an immediate threat to the officers' or public's safety; and (3) whether the suspect was resisting arrest or attempting to escape. Third, we

balance the gravity of the intrusion on the individual against the
government's need for that intrusion.  Ultimately, we must balance the
force that was used by the officers against the need for such force to
determine whether the force used was "greater than is reasonable
under the circumstances.

*Espinosa v. City & Cnty. of S.F.*, 598 F.3d 528, 537 (9th Cir. 2010) (internal

quotation marks and citations omitted).  The reasonableness analysis is not limited

to these factors; rather, "we examine the totality of the circumstances and consider

'whatever specific factors may be appropriate in a particular case, whether or not

listed in *Graham*.'"  *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010)

(citation omitted).

      1.  <u>Use of Force Upon Entry</u>

Sergeant Combs and Deputy Snyder first used force against Plaintiff when

they deployed their tasers in dart mode when Plaintiff came to the back door.  As

Plaintiff acknowledges, only one dart from Sergeant Combs' taser hit him.  As a

result of this taser application, Plaintiff admits he did not suffer any electrical

current or charge, the expected resulted of an effective taser application.

First, the Court finds the severity of this intrusion to be minimal.  "Rather

than relying on broad characterizations, we must evaluate the nature of the specific

force employed in a specific factual situation." *Id.* at 825.  Although the intended

response when a taser hits someone in dart-mode is that the "electrical impulse

instantly overrides the victim's central nervous system, paralyzing the muscles

throughout the body, rendering the target limp and helpless," *Mattos*, 661 F.3d at 449 (quoting *Bryan*, 630 F.3d at 824), Plaintiff concedes that this was not the intrusion here. Plaintiff did not feel any electric charge or current pulsing through his body; rather, he felt one dart, which did not override his central nervous system, and only resulted in a freckle to his chest. *See Fontana v. Haskin*, 262 F.3d 871, 880 (9th Cir. 2001) ("[N]ot every . . . bodily intrusion during an arrest is actionable as a violation of the Fourth Amendment. Some bodily intrusions may be provably accidental or *de minimis* and thus constitutionally reasonable.").

Second, looking at the undisputed facts, the governmental interests at stake justified the minimal level of force used. Upon entry, the officers had probable cause to arrest for domestic violence assault in the fourth degree: a misdemeanor. Although it is disputed whether Plaintiff advanced towards the officers, it is undisputed that Plaintiff came to the door screaming, intoxicated, emotionally upset, and at the very least, "displeased" with the officers. Further, the taser video provides some evidence that Plaintiff did move beyond the threshold of the door towards the officers. Whether or not Plaintiff advanced towards the officers, they reasonably viewed him as a threat. Finally, looking at "specific factors relevant to the totality of the circumstances," the officers were responding to a domestic violence call and thus the reasonableness of their actions must be taken in light of the danger the overall situation posed. *See Mattos*, 661 F.3d at 450 ("When

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT ~ 41

officers respond to a domestic abuse call, they understand that violence may be

lurking and explode with little warning. Indeed, more officers are killed or injured

on domestic violence calls than on any other type of call.").  Although Sergeant

Combs and Deputy Snyder did not explicitly warn Plaintiff that they were going to

deploy their tasers, such warning was not plausible given the rapid succession of

events.  *Id.* at 451 ("We have previously concluded that an officer's failure to

warn, when it is plausible to do so, weighs in favor of finding a constitutional

violation.").  Moreover, the officers' commands, although not fully understood by

Plaintiff, reasonably put Plaintiff on notice that the officers would take action if he

continued to disobey their commands.  Thus, given the totality of the

circumstances, this Court finds that no reasonable jury could find the initial, and

overall ineffective, use of force excessive.  Accordingly, summary judgment in

favor of Defendants on this portion of Plaintiff's excessive force claim is

appropriate.

2.  <u>Use of Force Upon Arrest</u>

The second excessive force analysis concerns the tackling of Plaintiff by

Deputy J. Snyder and Sergeant Combs' repeated use of his taser in the drive-stun

mode.  First, considering the type and amount of force inflicted, the use of a taser

in drive-stun mode is the direct application of an electric shock to a person.  *Id.* at

443.  Although Plaintiff's deposition and briefing sheds little light on the level of

pain he experienced from the drive-stun applications,[11] the Court's inquiry focuses more on the reasonableness of the officers' actions in light of the governmental interests at stake. At the time Deputy J. Snyder tackled Plaintiff and Sergeant Combs tased Plaintiff in drive stun mode, the following are the undisputed facts surrounding the altercation: (1) Deputies J. and G. Snyder observed Plaintiff attacking Sergeant Combs, which conduct Plaintiff does not fully dispute; (2) the officers had probable cause to arrest Plaintiff for domestic violence and fourth degree assault; (3) Plaintiff was screaming at the officers and yelling profanities; and (4) Plaintiff continued to struggle and failed to obey the officers' commands. Although Sergeant Combs again failed to warn Plaintiff before deploying his taser, the act of pinning Plaintiff down and placing him in restraints all happened in a matter of seconds and did not plausibly lend itself to a warning given over Plaintiff's screams and the officers' commands. Thus, given the totality of the circumstances, this Court finds that no reasonable jury could find the use of force within the home excessive. Accordingly, summary judgment in favor of Defendants on this portion of Plaintiff's excessive force claim is also appropriate.

//

---

[11] Although Plaintiff asserts that he will testify to the fact that he was incapacitated by drive-stun applications, ECF No. 95 ¶ 30, his deposition does not support this assertion, *see* ECF No. 63-4 at 10.

### E. Warrantless Arrest

"It is well established that 'an arrest without probable cause violates the Fourth Amendment and gives rise to a claim for damages under § 1983.'" *Rosenbaum v. Washoe Cnty.*, 663 F.3d 1071, 1076 (9th Cir. 2011) (quoting *Borunda v. Richmond*, 885 F.2d 1384, 1391 (9th Cir. 1988)).   "An officer has probable cause to make a warrantless arrest when the facts and circumstances within his knowledge are sufficient for a reasonably prudent person to believe that the suspect has committed a crime." *Id.*  The probable cause analysis looks to the facts known to the officer at the time of the arrest and the criminal statute to which those facts apply.  *Id.*

At the time of Plaintiff's arrest, the officers had the following information: (1) the officers knew they were responding to a domestic violence report; (2) when they arrived at the scene, the officers were told by witnesses that Plaintiff either rushed at Ms. Ausman, intending to throw her to the ground, but tackled *en route* by one of the male witnesses, or that he actually made contact with Ms. Ausman and threw her to the ground; (3) the police report notes that Ms. Ausman complained of back pain from the fall; and (4) Ms. Ausman was visibly upset.

Applying these facts to the law, a person is guilty of fourth degree assault when he assaults another; when committed between household members, this conduct is an act of domestic violence.  RCW 9A.36.041(1), 10.99.020(5).

Although not statutorily defined, Washington courts recognize three definitions of assault: "(1) an attempt, with unlawful force, to inflict bodily injury upon another; (2) an unlawful touching with criminal intent; and (3) putting another in apprehension of harm whether or not the actor intends to inflict or is incapable of inflicting that harm."  *State v. Stevens*, 158 Wash.2d 304, 311 (2006) (citing *Clark v. Baines*, 150 Wash.2d 905, 909 n.3 (2004)).  When an officer has probable cause to believe that a domestic assault has occurred, Washington law directs the "police officer *shall* arrest and take into custody" the suspect.  RCW 10.31.100(2)(c) (emphasis added).

This Court finds no issue of genuine dispute that the officers had probable cause to arrest Plaintiff for fourth degree assault and domestic violence and thus were required to do so under Washington law.  Under either version of events told to the officers by witnesses on the scene, the officers had probable cause to believe Plaintiff assaulted Ms. Ausman.  Plaintiff does not dispute that these witnesses made statements to the officers; rather, he disputes the level of detail and the trustworthiness of this information.  Although the officers stated that they wished to talk with Plaintiff and obtain his version of events before making any arrest, proceeding with this level of caution does not diminish the probable cause that was present to execute an arrest.  Accordingly, based on the undisputed facts at issue,

this Court finds summary judgment on this claim as against all Defendants is appropriate.

**E. Substantive Due Process**

Plaintiff's final contention is that he was subject to punitive jail conditions while in custody at the Asotin County Jail.  Plaintiff's claim rests on two conditions of confinement: he was (1) forced to sleep on a mattress on the concrete floor, and (2) deprived of toilet paper throughout his first day in jail.

"Pretrial detainees have a substantive due process right against restrictions that amount to punishment."  *Valdez v. Rosenbaum*, 302 F.3d 1039, 1045 (9th Cir. 2002) (citing *United States v. Salerno*, 481 U.S. 739, 746 (1987)).  If restrictions or jail conditions are "imposed for the purpose of punishment," a pretrial detainee's substantive due process right has been violated.  *Id.* (quoting *Bell v. Wolfish*, 441 U.S. 520, 535 (1979)).

> [T]he determination of whether a particular condition or restriction imposes punishment in the constitutional sense will generally turn on whether an alternate purpose is reasonably assignable: if a particular condition or restriction of pre-trial detention is reasonably related to a legitimate governmental objective, it does not without more, amount to "punishment." Conversely, if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees qua detainees.

*Pierce v. Cnty. of Orange*, 526 F.3d 1190, 1205 (9th Cir. 2008) (citing *Bell*, 441 U.S. at 539). "Legitimate nonpunitive governmental objectives include "maintaining security and order" and "operating the detention facility in a manageable fashion." *Id.* (citing *Bell*, 441 U.S. at 540 n. 23). "[T]o constitute punishment, the harm or disability caused by the government's action must either significantly exceed, or be independent of, the inherent discomforts of confinement." *Demery v. Arpaio*, 378 F.3d 1020, 1030 (9th Cir. 2004) (citing *Bell*, 441 U.S. at 537).

This Court finds no genuine dispute that the jail conditions to which Plaintiff was subject were merely part of the "inherent discomforts of confinement" and do not evidence punitive conduct. First, regarding the instruction that Plaintiff sleep on his mattress on the cement floor of his cell, Plaintiff has failed to demonstrate how this amounts to punishment. According to the jail event log, all of the other general population cells had, at some point in time, three detainees per cell. ECF No. 66-2. Further, Deputy Rudy represented in his declaration that the jail often operates at capacity, resulting in fewer bunks than detainees. ECF No. 66 ¶ 5. Short of turning away arrestees, Asotin County Jail has little choice but to place three detainees in two-bunk rooms when the jail is operating beyond capacity. Moreover, as a practical matter, some of the cell bunks are made of concrete

attached to the wall.  Thus, whether a detainee is on a mattress on a concrete bunk or on the same mattress on the concrete floor is a distinction without a difference.[12]

Second, the toilet paper restriction similarly does not amount to a violation of Plaintiff's substantive due process rights.  Defendants have put forth several legitimate reasons why male detainees are not given toilet paper upon booking, including the rationale that some inmates do not remain in custody long enough to need it and excess toilet paper can be fashioned into a weapon or used to clog the cell's plumbing.  Plaintiff has not put forth any evidence, beyond mere allegations, that this restriction was imposed to punish Plaintiff.  Plaintiff requested toilet paper once, despite numerous other opportunities to do so, and was able to wait to defecate until he received a supply in the afternoon.  Although Plaintiff asserts that he suffered discomfort due to this delay, he never expressed this discomfort to jail staff.  Accordingly, because no reasonable jury could find that these conditions amounted to anything beyond the inherent discomforts of confinement, Asotin County Defendants are entitled to summary judgment on this claim.

//

//

//

---

[12] In his deposition, Plaintiff testified that the floor of his cell was clean and that he slept on the opposite side of the cell as the toilet.  ECF No. 63-5 at 3, 6.

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT ~ 48

**IT IS HEREBY ORDERED:**

1.  Asotin County Defendants' Motion for Summary Judgment (ECF No. 61) is **GRANTED**.

2.  Clarkston Defendants' Motion & Memorandum of Authorities in Support of Motion for Summary Judgment (ECF No. 71) is **GRANTED**.

3.  Defendants' *Daubert* Motion to Exclude Portions of Expert Witness Winthrop Taylor's Report and Testimony (ECF No. 77, 79) is **DENIED** as moot.

The District Court Executive is hereby directed to enter this Order, provide copies to counsel, enter **JUDGMENT** for Defendants, and **CLOSE** the file.

**DATED** March 18, 2015.

THOMAS O. RICE
United States District Judge